Penny L. DILLON, Plaintiff,

v.

**Fran CARLTON, as Clerk of the Circuit and County Court, Orange County, Florida, Defendant.**

No. 96–434–CIV–ORL–22.

United States District Court,
M.D. Florida,
Orlando Division.

Aug. 14, 1997.

Vincent W. Howard, Jr., Howard & Reyes, Chartered, Sanford, FL, for Plaintiff.

Kevin W. Shaughnessy, Carolyn L. Kunz, Akerman, Senterfitt & Eidson, Orlando, FL, for Defendant.

## ORDER

CONWAY, District Judge.

### I. INTRODUCTION

The Plaintiff, Penny Dillon, is a former employee of Fran Carlton, Clerk of the Circuit and County Courts for Orange County, Florida. Dillon sues Carlton for allegedly violating the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* The parties have filed cross-motions for summary judgment. After carefully considering these motions, the Court determines that Carlton is entitled to summary judgment.

### II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The party seeking summary judgment bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Cohen v. United American Bank of Cent. Fla.,* 83 F.3d 1347, 1349 (11th Cir.1996) (quoting *Cox v. Administrator United States Steel & Carnegie,* 17 F.3d 1386, 1396, *modified on other grounds,* 30 F.3d 1347 (11th Cir.1994), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995)). "There is no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen,* 83 F.3d at 1349. The Court considers the evidence and all inferences drawn therefrom in the light most favorable to the non-moving party. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir.1993).

### III. FACTS [1]

Dillon began working for Carlton in 1990. Throughout her employment, Dillon experienced attendance problems. Those problems resulted in her being placed on probation in July 1994.

In November, 1993, Dillon's son, Kyle, was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). The diagnosis was made by Irwin T. Taylor, M.D., a board-certified pediatric physician.[2]

In September 1994, Kyle was suspended from after-kindergarten day care for violent behavior. School personnel suggested that Dillon try to spend more time with Kyle. Accordingly, Dillon requested modification of her work schedule pursuant to the FMLA in order to provide a more structured environment for Kyle at home after school, and to transport him to medical and counseling appointments. In connection with that request, Dillon submitted a medical certification form. The request for FMLA leave was approved on September 27, 1994.

In January 1995, Dillon requested a modification of her FMLA leave. For financial reasons, Dillon needed to increase her hours so that she worked until 3:30 p.m., rather than 1:00 p.m.[3] Carlton required Dillon to obtain a medical recertification in connection with this request. Dillon submitted the necessary paperwork, and the request was approved.

---

**1.** Except as noted herein, the facts set forth in this Order are not in dispute.

**2.** Although Dr. Taylor initially diagnosed and treated Kyle for ADHD, Dillon's employer-provided insurance plan changed, with the result that Dillon could no longer obtain treatment from Dr. Taylor. As a result, all of the medical certifications obtained in connection with Dillon's FMLA requests were signed by physicians other than Dr. Taylor. After Dillon left her employment with Carlton, Kyle returned to Dr. Tay-

lor as a Medicaid patient. Dr. Taylor continues to treat Kyle.

**3.** Kyle was still prohibited from attending public after-kindergarten day care. However, Dillon had arranged for him to attend private after-school day care. Kyle was bused from school to day care, allowing Dillon to work until 3:30 p.m. After leaving work, Dillon would pick Kyle up from day care.

In February 1995, school personnel reported an improvement in Kyle's behavior. Accordingly, Dillon returned to her regular work schedule.

Thereafter, Kyle's behavior at school degenerated. On May 19, 1995, at the request of school personnel, Dillon attended a meeting designed to address Kyle's behavioral problems. In connection with that meeting, school officials developed a written individualized accommodation plan for Kyle. Exhibit "I" to Dkt. 22.

The plan recommended a number of measures to accommodate Kyle's ADHD. Additionally, the document noted the following "intervention":

> Mom (Mrs. Dillon) will shorten work schedule for approximately 2 weeks to allow more quality time to be spent with Kyle. Any difference or change in Kyle's behavior will be noted and documented.

*Id.*

On May 19, 1995, the same day the school meeting took place, Dillon presented her supervisors with a copy of the accommodation plan and informed them that it would again be necessary for her to reduce her work schedule[4] in approximately two weeks.[5] On either May 30 or 31, 1995, Dillon was given a medical certification form and was told that it would have to be completed before she could begin her new schedule.[6] Dillon presented the medical certification to her superiors on June 2, the same day she had planned to begin her reduced work schedule by leaving at 1:00 p.m.

This certification differed from the two certifications Dillon had previously submitted in support of requested FMLA leave. This time, the physician who completed the form,

Dr. Kimberly Bougoulais, did not certify that Kyle Dillon had a serious health condition. In that regard, although the form confirmed the diagnosis of ADHD, Dr. Bougoulais twice crossed through the phrase "serious health condition" in relation to Kyle. Additionally, while Dr. Bougoulais answered "yes" to the question: "Does (or will) the patient require assistance for basic medical, hygiene, nutritional needs, safety or transportation?", immediately following that question, she added the statement: "As all children do."

Dillon continued to experience attendance problems after notifying her employer that it would be necessary for her to return to a reduced work schedule. Specifically, on May 26, 1995, a friend called in for Dillon to say that she would be late; however, Dillon never reported to work that day. On May 30, Dillon arrived at work on 11:00 a.m. and left at 1:00 a.m. The next day, Dillon did not report to work until 1:30 p.m. On June 2, the day Dillon submitted the medical certification form, Dillon did not arrive at work until 9:30 a.m.

That same day, Charlotte Benson, Chief Deputy Clerk, disapproved Dillon's request for FMLA leave on the following basis: "Doctor did not certify serious health condition." Dillon was notified of that decision at around noon that day. At that time Dillon was also informed that she was being placed on probation for her attendance problems and was advised that "[s]hould she fail to work her 8 AM to 5:00 P.M. hours termination will be required."[7] Dillon had planned to pick her son up from school immediately upon leaving work at 1:00 p.m.; she had not made arrangements for Kyle to attend after-school care that day. Accord-

---

4. Carlton has attempted to characterize this request as one seeking "intermittent" leave. However, the employee certification Dillon eventually submitted in connection with this request clearly stated that Dillon was requesting "reduced work week" leave. That distinction is irrelevant for present purposes.

5. Dillon has testified that "shortly after" May 19, she informed her employer that she planned to start her leave on June 2. Dkt. 29 at 129.

6. In their summary judgment papers, both Dillon and Carlton have suggested that May 30, 1995

was the date on which Dillon received the physician certification form. However, Dillon has testified that she received the certification form on the Wednesday immediately preceding Friday, June 2, 1995. Dkt. 29 at 106. That Wednesday was May 31, 1995. The Court's summary judgment analysis is unaffected by whether the correct date is May 30 or, instead, May 31.

7. Dillon contends that she was told that if she left at 1:00 p.m. that day, she should consider herself terminated.

ingly, Dillon left work at 1:00 p.m., and did not thereafter return. Subsequently, Carlton removed Dillon from the payroll.

## IV. GENERAL FMLA FRAMEWORK

The FMLA entitles an "eligible employee . . . to a total of 12 workweeks of leave during any 12 month period" in order to, *inter alia*, "care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). The Act defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves . . . inpatient care in a hospital, hospice, or residential medical care facility;" or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(A) & (B).

Leave taken in relation to a serious health condition "may be taken intermittently or on a reduced leave schedule when medically necessary." 29 U.S.C. § 2612(b)(1). An employer may require that such a request for leave be supported by a certification issued by the health care provider of the employee or family member who suffers from the serious health condition. 29 U.S.C. § 2613(a). The Act specifies what information must be included in the certification for it to be considered sufficient. 29 U.S.C. § 2613(b).

An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided under the FMLA. 29 U.S.C. § 2615(a)(1). Violations of the Act subject an employer to liability for specified types of damages and equitable relief. 29 U.S.C. § 2617(a)(1)(A) & (B).

## V. ANALYSIS

### A. CARLTON'S MOTION

Carlton seeks summary judgment on the ground that Dillon cannot establish a *prima facie* case under the FMLA. Additionally, Carlton maintains that it has articulated a legitimate, non-discriminatory reason for Dil-

lon's discharge, and Dillon cannot show that reason was pretextual.[8]

For present purposes, the Court will assume that Dillon has established a *prima facie* case. The Court will further assume that Carlton terminated Dillon for leaving work early on June 2, 1995. Given these assumptions, the Court's remaining task is to examine (1) whether Carlton has articulated a legitimate, non-discriminatory reason for terminating Dillon, and, if so, (2) whether Dillon has presented sufficient evidence of pretext to survive summary judgment.

#### 1. Legitimate, Non–Discriminatory Reason for Termination

It is undisputed that Dillon had a history of tardiness and absenteeism, severe enough to warrant Carlton placing her on probation in 1994. It is further undisputed that Dillon's attendance problems continued to the very last day of her employment. Specifically, during the period May 26—June 1, 1995, Dillon did not report for work on one day (after someone called in saying she would be late), and she was late on three other days, including the last day she worked.

Clearly, the final medical certification form Dillon submitted did not certify that Kyle had a serious health condition; a reasonable fact-finder could not conclude otherwise. As a result, says Carlton, Dillon did not have a right under the FMLA to leave work early on June 2, and her unauthorized departure was a legitimate ground for termination.

■ Dillon counters that Carlton could not properly refuse to permit Dillon to begin her FMLA leave on June 2 because Carlton failed to comply with a number of FMLA regulations. In that regard, Dillon first attempts to characterize the final request for a medical certification as a request for "recertification" within the meaning of 29 C.F.R. § 825.308. The Court rejects this characterization. Plainly, the final request was for a new certification, not recertification. Prior to the final request, Kyle's condition had

---

8. "Courts have used the Title VII analysis in determining summary judgment motions in cases brought under the FMLA, and have applied the *McDonnell Douglas* burden shifting approach to such claims." *Lisa Dumoulin v. Daniel Formica,* *McDonald's of Ravena/Delmar, Inc.,* 968 F.Supp. 68, 71 (N.D.N.Y.1997). The parties have essentially stipulated that the *McDonnell Douglas* framework applies to this action. *See* Joint Pretrial Statement (Dkt.49), XI.B & C, at 23.

improved to the point that Dillon was able to return to her regular work schedule. Accordingly, § 825.308 is inapplicable.

Dillon next cites 29 C.F.R. § 825.307 for the proposition that in the face of the medical certification Dillon submitted on June 2, Carlton could only request Dillon to obtain a second medical opinion; pending receipt of that opinion, Dillon was provisionally entitled to FMLA leave. However, an employer is only required to follow that course of action when it "has reason to doubt the validity of a medical certification[.]" § 825.307(a)(2). Under the undisputed facts, Carlton did not have reason to doubt the validity of the medical certification. Clearly, the form did not certify that Kyle had a serious health condition. No reasonable factfinder could find otherwise. Thus, § 825.307 did not preclude Carlton from denying Dillon's FMLA leave request.

Finally, Dillon contends that Carlton did not give Dillon timely notice of the necessity of the final medical certification. In that regard, Dillon cites 29 C.F.R. § 825.305(c), which provides, in pertinent part, as follows:

> In most cases, the employer should request that an employee furnish certification from a health care provider at the time the employee gives notice of the need for leave or within two business days thereafter, or, in the case of unforseen leave, within two business days after the leave commences.

However, in the context of this case, § 825.305(c) is irrelevant. Regardless of the notice Carlton gave Dillon, Dillon was able to have a physician complete a medical certification form, to submit the completed form to her employer, and to receive a decision on her request for FMLA leave, before the time she was scheduled to commence leave. This is not a situation where an employer gives insufficient notice of the necessity of a medical certification, the employee is unable to have a doctor complete a certification form, and, as a result, the employee is denied FMLA benefits. If it were—if Carlton had

terminated Dillon because Dillon commenced leave after being unable to have a physician complete the certification form—then § 825.305(c) might stand as an impediment to Carlton's action. On the state of the present record, however, § 825.305(c) is of no assistance to Dillon.[9]

Based on the foregoing, the Court determines that Carlton has articulated a legitimate, non-discriminatory reason for terminating Dillon. The Court next examines whether Dillon has presented evidence of pretext sufficient to defeat Carlton's motion for summary judgment.

### 2. Pretext

Dillon has not presented any evidence suggesting that Carlton's asserted reason for severing Dillon's employment—absence from work—was not the true reason for her discharge. Dillon makes much of the fact that Carlton has variously argued that Dillon was terminated, or was considered to have voluntarily resigned because she refused to return to work or contact anyone at work for three consecutive days. Whether Carlton terminated Dillon because she left work on June 2 or, instead, removed Dillon from the payroll because she did not return to work or call for three days, is immaterial to the pretext issue. In either event, Carlton has consistently maintained that Dillon's employment ended because she was absent from work without permission.

There is nothing in the record suggesting that Carlton harbored a secret motive to deny Dillon FMLA rights or to retaliate against her for the assertion of those rights. To the contrary, the record reflects that it was one of Dillon's supervisors who suggested in the first instance that Dillon explore her rights under the FMLA. *See* Dkt. 24, ¶ 9, at 2; Dkt. 29 at 44–45. Moreover, it is undisputed that Dillon's previous FMLA leave requests had been granted, without incident.

---

9. For the same reason, 29 C.F.R. § 825.305(b), suggesting that an employer must afford an employee 15 days to provide a medical certification, except where the employee has given 30 days' notice of foreseeable leave, did not preclude Carlton from denying Dillon's FMLA leave request.

■ Finally, the timing of Dillon's termination, standing alone, is insufficient to raise an inference of pretext. On this point, *McCown v. UOP, Inc.*, 1995 WL 519818 (N.D.Ill. August 30, 1995), is instructive. In *McCown*, an employee was granted FMLA leave by means of a memo· dated December 8, 1993. Two days later, her supervisor wrote her a memo noting her excessive absenteeism, and stating that it was "doubly important" for her to be at work because of her reduced work schedule. More than three months later, on March 1, 1994, the employee was terminated for poor performance, excessive absenteeism and tardiness, and excessive personal phone calls. In evaluating the employee's FMLA claim, the district court stated:

> McCown asks us to infer from the timing of [her supervisor's] memo of December 10, which came just two days after her FMLA leave was approved, that [her supervisor] was motivated by a discriminatory intent. We cannot accept this argument in the absence of additional facts to support it. If timing alone were sufficient, any employer who granted an employee leave under the FMLA would thereafter have its hands tied regarding any discipline of that employee. The FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave.

1995 WL 519818 *6.

This reasoning applies equally to the instant case. Because Carlton's denial of Dillon's FMLA request was proper, Dillon did not have the right to leave work early or to remain away from work. Dillon lost her job because of her failure to be at work. A reasonable fact-finder could not conclude otherwise.

## B. DILLON'S MOTION

The foregoing analysis is dispositive of Dillon's motion for summary judgment, as well. Based on the reasoning set forth above, that motion is due to be denied.

## VI. CONCLUSION

■ It is clear that Dillon found herself in a difficult position on the afternoon of June 2, 1995. However, "[n]o matter where our sympathies may lie, the Court is duty bound to carry out the edict of the FMLA as mandated by Congress." *Seidle v. Provident Mut. Life Ins. Co.*, 871 F.Supp. 238, 246 (E.D.Pa.1994). Accordingly, it is ORDERED as follows:

1. Plaintiff's Motion for Summary Judgment on Liability (Dkt.14), filed May 1, 1997, is DENIED.

2. Defendant's Dispositive Motion for Summary Judgment (Dkt.21), filed May 1, 1997, is GRANTED.

3. The Clerk shall enter a final judgment providing that the Plaintiff, Penny L. Dillon, shall take nothing on her claim against the Defendant, Fran Carlton, as Clerk of the Circuit and County Courts, Orange County, Florida, and that the Defendant shall recover its costs of action.

4. Any other pending motions are MOOT.

5. This case is removed from the September 1997 trial· calendar.

6. The Clerk shall close this case.